No. 1:18-cv-22204-KMW

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
(MIAMI)

◆

REVERSE MORTGAGE SOLUTIONS, INC.,

*Appellant,*

v.

ALEIDA C. NUNEZ,

*Appellee.*

◆

On Appeal from the United States Bankruptcy Court
for the Southern District of Florida
Case No. 17-21018-LMI

◆

REVERSE MORTGAGE SOLUTIONS, INC.'S BRIEF

◆

Edwin Gilbert Rice
BRADLEY ARANT BOULT
CUMMINGS LLP
100 S. Ashley Drive #1300
PO Box 3333
Tampa, FL 33601-3333
813-229-3333
erice@bradley.com

James B. Bailey
(*pro hac vice pending*)
BRADLEY ARANT BOULT
CUMMINGS LLP
1819 Fifth Avenue North
Birmingham, AL 35203
205-521-8913
jbailey@bradley.com

COUNSEL FOR APPELLANT REVERSE MORTGAGE SOLUTIONS, INC.

## <u>CORPORATE OWNERSHIP STATEMENT</u>

RMS is a non-governmental corporate entity that is wholly owned by Ditech Holding Corporation, which is a non-governmental, publicly traded corporation listed under the New York Stock Exchange as DHCP. No other entity owns more than 10% of RMS.

TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ iv

STATEMENT REGARDING ORAL ARGUMENT ................................................1

JURISDICTIONAL STATEMENT .....................................................................2

STANDARD OF REVIEW ...............................................................................2

STATEMENT OF THE ISSUES ........................................................................3

STATEMENT OF THE CASE ..........................................................................4

      A.     The Reverse Mortgage Transaction with the Debtor's Mother. ..........5

      B.     The Debtor's Bankruptcy Filing. ......................................................11

      C.     The Debtor's Chapter 13 Plan and RMS's Objection.........................11

      D.     Bankruptcy Court Overrules RMS's Plan Objections. .......................13

      E.     The Motion to Alter or Amend the Judgment....................................16

SUMMARY OF ARGUMENT ........................................................................19

ARGUMENT ..............................................................................................21

I.     The Bankruptcy Court Erred in Holding that the Debtor was a
     "Borrower" Entitled to Maintain Possession of the Mortgaged
     Property After Her Mother's Death...................................................21

      A.     Florida Law Mandates that Courts Construe all Reverse
           Mortgage Loan Documents Together. .................................................21

      B.     If There Is An Inconsistency Between the Language of the Note
           and Mortgage, the Note Controls.......................................................28

      C.     Properly Construing the Term "Borrower" as Excluding the
           Debtor Does Not Render the Security Instrument Invalid..................30

D.      The Code of Federal Regulations and HUD Mortgagee Letter
        Do not Control the terms of the Security Instrument...........................34

E.      *Johnson v. Home State Bank* Does Not Support the Bankruptcy
        Court's Ruling. .....................................................................................38

II.     The Bankruptcy Court Erred by Failing to Hold an Evidentiary
        Hearing.................................................................................................39

CONCLUSION .........................................................................................................41

CERTIFICATE OF SERVICE .........................................................................................42

CERTIFICATE OF COMPLIANCE ...................................................................................43

STATUTORY APPENDIX.......................................................................................APP-1

## TABLE OF AUTHORITIES

**Cases**

*Ave. CLO Fund Ltd. v. Bank of Am., NA*,
    709 F.3d 1072 (11th Cir. 2013) ..................................................................2, 40

*Bennett v. Donovan*,
    4 F. Supp. 3d 5 (D.D.C. 2013)........................................................................37

*Boyette v. Carden*,
    347 So. 2d 759 (Fla. 1st DCA 1977) .................................................. 22, 23, 29

*CitiMortgage, Inc. v. Turner*,
    172 So. 3d 502 (Fla. 1st DCA 2015) ..............................................................33

*Cleveland v. Crown Fin'l, LLC*,
    183 So. 3d 1206 (Fla. 1st DCA 2016) ............................................................29

*Consolo v. Bank of America*,
    2017 WL 1739171 (Mass. Dist. Ct. May 2, 2017) .................................. 13, 28

*Countrywide Home Loans, Inc. v. Kim*,
    898 So. 2d 250 (Fla 4th DCA 2005)...............................................................33

*Dodge City, Inc. v. Byrne*,
    693 So. 2d 1033 (Fla. 2d DCA 1997)...................................................... 22, 23

*Edwards v. Reverse Mortgage Solutions, Inc.*,
    187 So. 3d 895 (Fla. 3d DCA 2016).................................................... passim

*Estate of Jones v. Live Well Fin., Inc.*,
    2017 WL 4176661 (N.D. Ga. Sept. 20, 2017)...............................................35

*Excelsior Ins. Co. v. Pomona Park Bar & Package Store*,
    369 So. 2d 938 (Fla. 1979) ............................................................................31

*Fed. Nat'l Mortg. Ass'n v. Takas*,
    No. 2:17-cv-204, 2017 WL 3016785 (D. Utah July 14, 2017) ....................35

*Gollnick v. Barker*,
    114 So. 527 (Fla. 1927) ..................................................................................32

*Gonzalez v. Chase Home Finance, LLC*,
 37 So. 3d 955 (Fla. 3d DCA 2010) ................................................................32

*Graham v. Fitts*,
 43 So. 512 (Fla. 1907) ...................................................... 22, 23, 29

*Harris v. Walbridge*,
 488 So. 2d 881 (Fla 1st DCA 1986) .............................................33

*Holmes v. Dunning*,
 133 So. 557 (Fla. 1931) ................................................................33

*Hotel Mgmt. Co. v. Krickl*,
 158 So. 118 (Fla. 1934) ...............................................................29

*In re Alford*,
 381 B.R. 336 (Bankr. M.D. Fla. 2007) ................................... 23, 40

*In re D'Alessio*,
 AP No. 17-3026, 2018 WL 2972340 (Bankr. D. Mass. June 11, 2018) .......28

*In re Gray*,
 530 B.R. 501 (Bankr. S.D. Fla. 2015) ..................................... 15, 39

*In re Harmon*,
 2015 WL 8249995 (Bankr. M.D. Fla. Dec. 2, 2015) ...................39

*In re Marcum*,
 508 B.R. 499 (Bankr. M.D. Fla. 2014) ........................................33

*In re Tennyson*,
 611 F.3d 873 (11th Cir. 2010) ......................................................2

*J.M. Montgomery Roofing Co. v. Fred Howland, Inc.*,
 98 So. 2d 484 (Fla. 1957) ............................................................23

*J.R.D. Mgmt. Corp. v. Dulin*,
 883 So. 2d 314 (Fla. 4th DCA 2004 ............................................31

*Johnson v. Home State Bank*,
 501 U.S. 78 (1991) ......................................................... 15, 38, 39

*Lewis v. Estate of Turcol*,
709 So. 2d 186 (Fla. 5th DCA 1998)............................................................29

*MV Insurance Consultants v. NAFH Nat. Bank*,
87 So. 3d 96 (Fla. 3d DCA 2012)...............................................................22

*Nationstar Mortg. Co. v. Levine*,
216 So. 3d 711 (Fla 4th DCA 2017)................................................ 17, 28, 40

*Nationstar Mortg. LLC v. Carey*,
C.A. No. 9274-MA, 2014 WL 6735445 (Del. Ch. Nov. 26, 2014) ..............35

*Nationstar Mortg., LLC v. Goeke*,
57 N.Y.S.3d 223 (N.Y. App. Div. 2017)......................................................35

*Nationstar Mortgage, LLC d/b/a Champion Mortgage Company v. Williams*,
2016 WL 5887356 (Pa. Super. Ct. Sept. 12, 2016) ......................................13

*OneWest Bank, FSB v. Palmero*,
__ So. 3d __, 2018 WL 1832326 (Fla. 3d DCA April 18, 2018).......... passim

*Pikaart v. Financial Freedom*,
2017 WL 5624747 (W.D. Mich. Oct. 31, 2017),
*Report and Recommendation adopted*,
2017 WL 5571120 (W.D. Mich. Nov. 11, 2017) .........................................28

*Reverse Mortgage Solutions, Inc. v. Eady*,
01-2014-CA-004485 (Fla. 8th DCA 2017) ..................................................16

*Sardon Found. v. New Horizons Serv. Dogs, Inc.*,
852 So.2d 416 (Fla. 5th DCA 2003).......................................... 22, 23, 25, 40

*Smith v. Reverse Mortgage Solutions*, *Inc.*,
200 So. 3d 221 (Fla. 3d DCA 2016)..................................................... passim

*Washington-Jarmon v. Onewest Bank, FSB*,
513 S.W.3d 103 (Tex. App.—Houston [14th Dist.] 2016, no pet.) . 28, 30, 35

**Statutes**

11 U.S.C. § 1322.......................................................................................39

11 U.S.C. § 1322............................................................................................12

11 U.S.C. § 1325............................................................................................39

11 U.S.C. § 362..............................................................................................11

28 U.S.C. § 1334..............................................................................................2

28 U.S.C. § 157................................................................................................2

**Other Authorities**

HUD Mortgagee Letter 1997-15.....................................................................32

**Rules**

FED. R. BANKR. P. 3015...................................................................................40

FED. R. BANKR. P. 9014...................................................................................40

**Treatises**

19 FLA. PRAC., *Florida Real Estate* (2018 ed.).............................................32

**Regulations**

24 C.F.R. § 206.27 ................................................................... 14, 36, 37

24 C.F.R. § 206.3 .................................................................... 14, 15, 37

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is appropriate in this bankruptcy appeal. This appeal involves important issues regarding the interpretation of standardized reverse mortgage contracts, and any decision could have significant precedential impact for both bankruptcy and non-bankruptcy proceedings. The Bankruptcy Court's error, should it stand, may enable debtors in bankruptcy to modify the rights and remedies of reverse mortgage lenders, even if the debtor was not (and never was intended to be) the borrower in the underlying transaction. Because of the importance of the issues presented for reverse mortgage lenders, and the near certainty that the same issue will arise in future cases in this District, oral argument is appropriate and likely to assist the Court.

## JURISDICTIONAL STATEMENT

The Bankruptcy Court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2) to rule upon Reverse Mortgage Solutions, Inc.'s ("RMS") objections to Debtor Aleida C. Nunez's ("Debtor") chapter 13 plan and the treatment of RMS's secured claim. This Court has appellate jurisdiction under 28 U.S.C. § 158(a). The Bankruptcy Court's orders holding that the Debtor is a "Borrower" entitled to maintain possession of property subject to RMS's reverse mortgage until she passes away, and that the Debtor may modify such reverse mortgage through a chapter 13 plan, are final orders that dispose of discrete disputes within the Debtor's chapter 13 case.[1]

## STANDARD OF REVIEW

This appeal challenges the Bankruptcy Court's interpretation of a reverse mortgage and related documents, which is subject to *de novo* review. *Ave. CLO Fund Ltd. v. Bank of Am., NA*, 709 F.3d 1072, 1077 (11th Cir. 2013) ("The interpretation of a contract is a question of law that the court reviews *de novo*."). The Bankruptcy Court's conclusions of law are also subject to *de novo* review. *See, e.g.*, *In re Tennyson*, 611 F.3d 873, 875 (11th Cir. 2010) ("Conclusions of law reached by a

---

[1] To the extent the Court may determine that the Bankruptcy Court's orders were interlocutory, RMS asks that the Court treat RMS's notice of appeal as a motion for leave to appeal pursuant to Bankruptcy Rule 8004(d).

bankruptcy court . . . are reviewed de novo." (citation and internal quotation marks omitted)).

### STATEMENT OF THE ISSUES

1.      Whether the Bankruptcy Court erred in overruling RMS's objection to the proposed Chapter 13 bankruptcy plan submitted by the Debtor based on the Bankruptcy Court's determination that the Debtor qualified as a "Borrower" under the reverse mortgage securing the debt owed to RMS?

2.      Whether the Bankruptcy Court erred by failing to consider the other documents executed as part of the origination of the reverse mortgage loan to determine whether Debtor met the definition of "Borrower" under the reverse mortgage?

3.      Whether the Bankruptcy Court erred by adhering to the ruling announced in its order overruling RMS's objection [DE 19] and denying RMS's motion for reconsideration [DE 63], despite the intervening decision by the Florida Third District Court of Appeal in *OneWest Bank, FSB v. Palmero*, __ So. 3d __, 2018 WL 1832326 (Fla. 3d DCA April 18, 2018), which held that the individual named as the "r[e]mainderman" in the definition of "Borrower" in the reverse mortgage did not qualify as a "Borrower"?

4.      Whether the Bankruptcy Court erred by failing to hold an evidentiary hearing in order to determine whether Debtor met the definition of "Borrower" under the reverse mortgage?

STATEMENT OF THE CASE

This appeal arises from a dispute over the terms of a reverse mortgage in a chapter 13 bankruptcy. The Debtor's mother was the borrower under a reverse mortgage loan, which allows eligible older homeowners to convert their home equity into cash with no monthly mortgage payments. The Debtor signed the reverse mortgage solely with respect to her interest in the property as a *remainderman*. The Debtor's mother died before the Debtor filed for bankruptcy. Under the terms of the reverse mortgage and related agreements, the mother's death was a breach entitling RMS to declare the reverse mortgage debt due and foreclose on the reverse mortgage. Nonetheless, the Debtor proposed a chapter 13 plan that treated the Debtor as a "Borrower" under the reverse mortgage who could remain in possession of the property for life without paying the underlying loan in full. RMS objected to the Debtor's chapter 13 plan, but the objection was overruled.

The Bankruptcy Court's judgment should be reversed. Among other things, the Bankruptcy Court did not apply the rules set forth in *OneWest Bank, FSB v. Palmero*, __ So. 3d __, 2018 WL 1832326 (Fla. 3d DCA April 18, 2018). In *Palmero*, the Third District Court of Appeals held that, under Florida law, courts

4

must examine all documents executed as part of a reverse mortgage loan to determine if a party is a "Borrower" entitled to possession of the property securing the loan until death. The Bankruptcy Court declined to follow *Palmero*, and held that—notwithstanding the fact that the Debtor did not execute the underlying note, loan agreement, or other loan documents—the Debtor was a "Borrower" under the reverse mortgage who could maintain possession of the property without satisfying the reverse mortgage in full through a chapter 13 plan.

## A.   The Reverse Mortgage Transaction with the Debtor's Mother.

### 1.   The Note and Loan Agreement

On June 24, 2008, Debtor's mother Olga Nunez executed a Home Equity Conversion Note ("Note") and Home Equity Conversion Loan Agreement ("Loan Agreement") in favor of World Alliance Financial Corp. Pursuant to the Note and Loan Agreement, Olga Nunez received a loan in the maximum principal amount of $531,000, secured by a reverse mortgage on real property located at 99440 Southwest 155th Avenue, Miami, Florida 33196 (the "Property"). DE 48 at 27-36.[2] The Debtor did not sign either the Note or Loan Agreement. DE 48 at 27-36.

The Note generally defined "Borrower" as "each person signing at the end of

---

[2] Citations to "DE" are the docket entries in the Debtor's bankruptcy case, Case No. 17-21018-LMI in the United States Bankruptcy Court for the Southern District of Florida.

this Note." DE 48 at 27. Olga Nunez was the only person who signed the Note as the "Borrower [who] accepts and agrees to the terms and covenants contained in this Note." DE 48 at 29.

The Note further stated that it is "secured by a mortgage, deed of trust or similar security instrument that is dated the same date as this Note and called 'Security Instrument.'" DE 48 at 27. Olga Nunez, as "Borrower" under the Note, has "no personal liability for payment of the debt." *Id.* The lender may only "enforce the debt through sale of the Property covered by the Security Instrument." *Id.* All principal and interest advanced under the Note is due on February 7, 2070, but the lender "***may require immediate payment in full of all outstanding principal and accrued interest if . . . Borrower dies and the Property is not the principal residence of at least one surviving Borrower.***" DE 48 at 28 (emphasis added). Again, the Debtor is not identified as a "Borrower" on the Note, and the Debtor did not sign the Note. DE 48 at 27, 29.

### 2.    *The Security Instrument*

The Debtor signed only one document in connection with Olga Nunez's reverse mortgage loan—the Adjustable Rate Home Equity Conversion Mortgage dated June 24, 2008. DE 48 at 18-26 (the "Security Instrument"). The Security Instrument recites the existence of the Loan Agreement and Note—which were executed by Olga Nunez—and the duty to repay amounts advance as "evidenced by

Borrower's Note." DE 48 at 18. The Security Instrument secures "the repayment of the debt evidenced by the Note . . . up to a maximum principal amount of Five Hundred and Thirty-One Thousand and 00/100 Dollars ($531,000.00)" as well as other amounts due under the Security Instrument and "the performance of Borrower's covenants and agreements under [the] Security Instrument and the Note." DE 48 at 18.

The Debtor is identified by name in two parts of the Security Instrument. First, the Debtor is identified as a mortgagor of her remainder interest in the property subject to the Security Instrument, while her mother Olga Nunez is identified as mortgagor of a life estate in the property—"The mortgagor is **Olga Nunez a/k/a Olga E Nunez, a single woman, as to Life Estate interest and Aleida C Nunez, a single woman, as to the remainder,** whose address is **9940 Southwest 155th Avenue, Miami, FL 33196** ("Borrower")." DE 48 at 18 (emphasis in original).

Second, the Debtor's name is on the signature page of the Security Instrument, identifying her "AS REMAINDERMAN":

7

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

Witnesses: _Anais Aragon_

_Mike Fernandez_

Signature:

x_Olga Ensuiz_
OLGA NUNEZ

_Aleida C. Nunez_
ALEIDA C NUNEZ, AS REMAINDERMAN

DE 48 at 24.

The Debtor's designation as a mortgagor "as to the remainder" and signing as "remainderman" under the Security Instrument was necessary because of Debtor's remainder interest in the Property. On June 24, 2008—the same day that Olga Nunez signed the Note and Loan Agreement—the Debtor and her mother executed a quit claim deed. The quit claim deed transferred the Debtor's joint tenancy interest in the Property, granting Olga Nunez a life estate, and a remainder interest retained by the Debtor. *See* DE 49 at 1-2.

The Security Instrument has similar language to the Note with respect to default and acceleration. In particular, paragraph 9 of the Security Instrument provides that "Lender may require immediate payment in full of all sums secured by this Security Instrument if: [a] Borrower dies and the Property is not the principal residence of at least one surviving Borrower . . . ." DE 48 at 20.

8

### 3.    Other Loan Documents

Olga Nunez executed a number of other documents to obtain the reverse mortgage loan. All of these documents identified Olga Nunez as the "Borrower," including:

- The Loan Agreement, which defined Olga Nunez as "Borrower" in the introductory paragraph. DE 48 at 31. Olga Nunez was the only person who signed the Loan Agreement as a "Borrower." DE 48 at 36.

- Residential Loan Application for Reverse Mortgages, which lists Olga Nunez under the section for "Borrower's Name." DE 48 at 39. The Debtor did not sign the Loan Application, even though there was a space for a "Co-Borrower's Signature." DE 48 at 41.

- HUD/VA Addendum to Uniform Residential Loan Application, which identifies Olga Nunez as the "Borrower" for at least two signatures certifying consent to verify social security number and other certifications necessary for loan origination. DE 48 at 44.

- A Borrower's Certificate confirming, among other things, that Olga Nunez, as "Borrower," will not have outstanding certain other unpaid obligations in connection with the mortgage transaction. DE 48 at 45.

- Settlement Statement for the reverse mortgage closing identifying

Olga Nunez as the "Borrower." DE 48 at 46. The Debtor did not sign the Settlement Statement, even though it included a signature line for a second "Borrower." DE 48 at 46

- Addendum to HUD-1 Settlement Statement for "CERTIFICATION OF BORROWER" signed by Olga Nunez. DE 48 at 48.

- Reverse Mortgage Analyst packet, which identified Olga Nunez as the "Borrower" for purposes of Home Equity Conversion Mortgage Insurance. DE 48 at 56. The Debtor did not sign any pages of the Reverse Mortgage Analyst packet. DE 48 at 50-56.

- Home Equity Conversion Mortgage Federal Loan Closing Truth-In-Lending Disclosure Statement, which identified Olga Nunez as "Borrower" in the signature block. DE 48 at 61.

- Certificate of HECM Counseling, which Olga Nunez signed recognizing that "Borrowers are those parties who have signed the Note *and* Mortgage or Deed of Trust." DE 48 at 62 (emphasis added).

### 4.    *Default and State Court Foreclosure Action*

On September 5, 2015, RMS filed a verified complaint to foreclose the Security Instrument against the Property based upon Olga Nunez's failure to pay taxes and maintain insurance, as required under the Security Instrument and related loan documents. DE 48 at 2-3.

Olga Nunez died on June 23, 2016. DE 48 at 38. RMS amended its state court foreclosure complaint to include Olga Nunez's death as an additional basis of default under the terms of the Note and Security Instrument. DE 48 at 3.

**B. The Debtor's Bankruptcy Filing.**

The Debtor filed a voluntary petition under chapter 13 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), on August 30, 2017. DE 1. The bankruptcy petition stayed RMS's foreclosure suit. 11 U.S.C. § 362(a).

RMS filed its proof of claim with respect to the Note and Security Instrument on November 13, 2017 (Claim No. 3-1) and filed an amended proof of claim on January 3, 2018 (Claim No. 3-2). The amended proof of claim asserts a total secured claim due and owing under the Note and Security Instrument in the amount of $390,671.74.

**C. The Debtor's Chapter 13 Plan and RMS's Objection.**

As required under the Bankruptcy Code, the Debtor filed a proposed a chapter 13 plan on the date she filed her petition. DE 7. The Debtor's plan proposed that she would cure the arrears for payment of insurance and taxes on the Note and Security Instrument through her plan and retain possession of the property, without paying the Note in full. *See* DE 7.

RMS filed a preliminary objection to the Debtor's plan on October 16, 2017. DE 19. RMS argued that the Debtor's mother was the only Borrower on the Note,

11

has passed away, and therefore the Note fully matured and was due and payable upon the Debtor's mother's death, before the Debtor's bankruptcy. DE 19 at 2. Accordingly, RMS argued that the Debtor could only modify RMS's rights under section 1322(c)(2) of the Bankruptcy Code by agreeing to pay all amounts due under the Note through the bankruptcy plan.[3]

The Debtor amended her chapter 13 plan on October 27, 2017, still proposing to retain the property securing the Note without paying RMS in full. DE 22. The Debtor also filed a response and amended response to RMS's plan objection. DE 24 and 25. The Debtor argued that the Security Instrument defined her as a "Borrower" and therefore RMS could not accelerate or foreclose as long as she is living. DE 25 at 1-3. The Debtor primarily relied upon two decisions from Florida's Third District Court of Appeals to support her position—*Smith v. Reverse Mortgage Solutions, Inc.*, 200 So. 3d 221 (Fla. 3d DCA 2016) and *Edwards v. Reverse Mortgage Solutions, Inc.*, 187 So. 3d 895 (Fla. 3d DCA 2016). DE 25 at 2-3; DE 44 (Debtor filing copies of *Smith* and *Edwards*).

On January 29, 2018, RMS filed a further Memorandum of Law in support of its objection to the Debtor's plan. DE 48. RMS argued that, construing the Security Instrument and related documents under Florida law, the Debtor is not a "Borrower"

---

[3] *See In re Gray*, 530 B.R. 501, 502 (Bankr. S.D. Fla. 2015) (debtor may pay off mother's reverse mortgage over life of chapter 13 plan even though debtor was not borrower under reverse mortgage).

under the Security Instrument and thus could not remain in possession of the Property without paying the Note in full. DE 48 at 1-7. RMS supplemented its objection to the Debtor's plan by filing copies of two decisions from courts outside of Florida addressing reverse mortgages in similar situations. DE 51 (citing *Nationstar Mortgage, LLC d/b/a Champion Mortgage Company v. Williams*, 2016 WL 5887356, at *3-5 (Pa. Super. Ct. Sept. 12, 2016) and *Consolo v. Bank of America*, 2017 WL 1739171, at *3 (Mass. Dist. Ct. May 2, 2017)).

### D.   Bankruptcy Court Overrules RMS's Plan Objections.

The Court held a hearing on RMS's objections to the Amended Plan on March 6, 2018, but did not allow argument from counsel for RMS. Tr. 3/6/18 at 9. At the March 6 hearing, the Court announced that it was overruling the Plan Objection because "the unambiguous mortgage . . . defines borrower as both the actual borrower and her daughter, the debtor." Tr. 3/6/18 at 5.

On March 28, 2018, the Bankruptcy Court entered its memorandum opinion and order overruling RMS's plan objection (the "Memorandum Opinion"). DE 59. The Bankruptcy Court held that "the Debtor, Aleida C. Nunez . . . was the 'Borrower' under the [Security Instrument] encumbering the Debtor's home . . . even though the Debtor was not the Borrower under the loan secured by the [Security Instrument], [and] the Debtor may [therefore] cure the [Security Instrument] defaults in her Chapter 13 Plan." DE 59 at 1-2. To reach this conclusion, the Bankruptcy

Court first held that it was not "necessary or appropriate to look at the other Loan Documents to determine what 'Borrower' means in the [Security Instrument]." DE 59 at 4. According to the Bankruptcy Court, the Security instrument is "unambiguous" and even though Florida case law "certainly invites, and sometimes dictates consideration of documents executed together as part of a contemporaneous transaction to determine the intent of the parties, none of those cases looks at documents to alter defined terms . . . ." *Id.*

The Bankruptcy Court further held that it was "bound by the holding of the Florida Third District Court of Appeal in *Smith v. Reverse Mortgage Solutions*, 200 So. 3d 221 (Fla. 3d DCA 2016)" and rejected RMS's arguments that *Smith* was distinguishable. *See* DE 59 at 5-6.

The Bankruptcy Court discussed the Code of Federal Regulations governing the federal insurance for reverse mortgages, and found that the version in effect at the time of Olga Nunez's reverse mortgage transaction in 2008 stated that the mortgage would come due and payable "if a *mortgagor* dies and the property is not the principal residence of at least one surviving *mortgagor* . . . ." *Id.* at 6 (quoting 24 C.F.R. § 206.27(c)(1)) (emphasis added).[4] The Bankruptcy Court concluded the only

---

[4] The Bankruptcy Court's March 28 Memorandum Opinion failed to note that the applicable portion of the Code of Federal Regulations in effect in 2008 expressly defined the term "mortgagor" as "each original **borrower** under a mortgage." 24 C.F.R. § 206.3 (2008) (emphasis added).  In turn, the term "mortgage" means "a first lien on real estate under the laws of the jurisdiction where the real estate is located .

way the Security Instrument could comply with the applicable regulations in 2008 was to read the term "Borrower" as applying to "both mortgagors – the Debtor and her mother." *Id.*

The Bankruptcy Court found further support for its ruling in HUD Mortgagee Letter 1997-15, which stated that in a reverse mortgage transaction "[a] holder of a future interest [in the property] does not execute the note or loan agreement and does not have the rights to loan proceeds of other mortgagors." DE 59 at 6-7. According to the Bankruptcy Court, Mortgagee Letter 1997-15 provides that a mortgagor who does not sign the reverse mortgage loan documents "does not lose his or her home so long as the mortgagor complies with the covenants of the reverse mortgage, to which terms he or she has subjected himself or herself as a 'borrower' under the reverse mortgage." DE 59 at 7.

Finally, citing *Johnson v. Home State Bank*, 501 U.S. 78 (1991) and *In re Gray*, 530 B.R. 501 (Bankr. S.D. Fla. 2015), the Bankruptcy Court held that the Debtor may modify RMS's rights against the property encumbered by the Security Instrument even though the Debtor did not sign the other reverse mortgage loan documents, and was not even eligible for a reverse mortgage. *See* DE 59 at 7.

Based on these conclusions, the Bankruptcy Court overruled RMS's

---

. . . [and] also includes **the credit instrument, or note, secured by the lien, and the loan agreement** between the mortgagor, the mortgagee and the Secretary." *See id.* (emphasis added).

objections to plan confirmation and held that the "Debtor is entitled to maintain the Reverse Mortgage by curing the defaults relating to taxes and insurance" without paying the Note in full through the term of her proposed plan. *See* DE 59 at 8.

### E.   The Motion to Alter or Amend the Judgment.

On April 11, 2018, RMS timely filed a motion to alter or amend the Memorandum Opinion under Federal Rule of Civil Procedure 59, as incorporated by Bankruptcy Rule 9023. DE 63. RMS argued that the Memorandum Opinion was based upon manifest errors of law or fact. *Id.* at 2.

First, RMS submitted that the Third District Court of Appeal's decisions in *Smith v. Reverse Mortgage Solutions*, 200 So. 3d 221 (Fla. 3d DCA 2016) and *Edwards v. Reverse Mortgage Solutions, Inc.*, 187 So.3d 895 (Fla. 3d DCA 2016) were not controlling because they had different facts. DE 63 at 2-6. Among other things, the party who was on the mortgage but not the note in those cases was the surviving spouse of the borrower. *See* DE 63 at 2-4. Nor did the mortgages in those cases have a signature block identifying a signatory as "Remainderman," which is how the Debtor is identified in the Security Instrument. *Id.* at 4. RMS argued that the Bankruptcy Court should have followed the decisions in *Reverse Mortgage Solutions, Inc. v. Eady*, 01-2014-CA-004485 (Fla. 8th DCA 2017), where the court examined all closing documents, and *Nationstar Mortgage Company v. Levine*, 216

16

So. 3d 711 (Fla 4th DCA 2017), where the signature block designation of a non-borrowing spouse resulted in a patent ambiguity. *See* DE 63 at 4-6.

RMS further submitted that the Bankruptcy Court should have held an evidentiary hearing to determine the parties' intent. DE 63 at 6-7. And finally, RMS argued that the Bankruptcy Court improperly relied on prior versions of 24 C.F.R. § 206.27 to support its conclusion that the Debtor was a "Borrower" under the Security Instrument. DE 63 at 7-9. This part of the Code of Federal Regulations governs the federal insurance program for reverse mortgages, but does not govern the enforceability of reverse mortgages that may not qualify for insurance based on their terms. DE 63 at 8-9.

On April 20, 2018, RMS supplemented its motion to alter or amend the judgment by filing a copy of *OneWest Bank, FSB. v. Luisa Palmero*, __ So. 3d __, 2018 WL 1832326 (Fla. 3d DCA Apr. 18, 2018).[5] DE 68. RMS followed the notice of the *Palmero* decision with a supplemental brief on May 4, 2018, explaining that *Palmero* was on point with the questions before the Bankruptcy Court regarding interpretation of the Security Instrument, limited the holdings in *Smith* and *Edwards*, and indicated that Florida law required sustaining RMS's objection to the Debtor's

---

[5] The notice of filing the *Palmero* decision provides the incorrect citation to WestLaw, but includes a correct copy of the Third District Court of Appeals decision. *See* DE 68.

17

plan. DE 71. The Debtor filed a response to RMS's motion to alter or amend the judgment on May 7, 2018. DE 74.

On May 8, 2018, the Bankruptcy Court held a hearing on RMS's motion to alter or amend the Memorandum Opinion. *See* Tr. 5/8/18. At the hearing, the Bankruptcy Court indicated that it was denying RMS's motion. *See* Tr. 5/8/18 at 24-30. In particular, the Bankruptcy Court held that an evidentiary hearing was unnecessary to determine the meaning of the Security Instrument. *See* Tr. 5/8/18 at 24. The Bankruptcy Court did agree with RMS that the *Palmero* decision qualified the Third District Court of Appeal's prior decisions in *Smith* and *Edwards* and stated that reliance on those opinions is "no longer a basis for [the Bankruptcy Court's] ruling." *See* Tr. 5/8/18 at 24. However, the Bankruptcy Court did not adopt the ruling in *Palmero*. Instead, the Bankruptcy Court held that "the only logical way to interpret the word 'borrower' in [the Security Instrument], and only for purposes of that document, includes the remainderman; that defined otherwise would make the mortgage potentially invalid . . . ." *See* Tr. 5/8/18 at 28-29. "[T]he only way that the debtor could be bound as a remainderman under the mortgage as drafted, is that the defined term 'borrower' in the mortgage included her, which, in fact, is exactly how the document is drafted." *See* Tr. 5/8/18 at 27.

The Bankruptcy Court entered an order denying RMS's motion on May 24, 2018, "for the reasons stated on the record." DE 79. The Bankruptcy Court entered

an amended order denying RMS's motion on May 25, 2018, stating that the "Court will issue a memorandum opinion outlining its reasons at a later date." DE 80. As of the date of filing this brief, the Bankruptcy Court has not issued a further opinion on the issues on appeal.

RMS timely filed its notice of appeal on June 1, 2018. DE 81.

SUMMARY OF ARGUMENT

The dispute among the parties is a matter of contract interpretation. The Bankruptcy Court's fundamental error was refusing to consider all loan documents executed at the time of the reverse mortgage transaction with the Debtor's mother. Examining these documents together it is clear that the Debtor is not entitled to maintain possession of the property for life without paying the Note in full. The Third Circuit Court of Appeal decision in *Palmero* is controlling and demands reversal of the Bankruptcy Court. The Bankruptcy Court's conclusion results in a windfall to the Debtor that is not warranted under the facts or the law.

The Bankruptcy Court's error in contract interpretation was compounded by its reliance on federal regulations that do not govern the enforceability of the loan documents between the parties and, in any event, do not support the Bankruptcy Court's interpretation.

Reversing the Bankruptcy Court will not deprive the Debtor of any rights in the property. She may still confirm a chapter 13 plan that pays off the Note in full in five years, refinance the mortgage, or even sell the property and retain any equity.

ARGUMENT

I.     **The Bankruptcy Court Erred in Holding that the Debtor was a "Borrower" Entitled to Maintain Possession of the Mortgaged Property After Her Mother's Death.**

The Bankruptcy Court committed reversible error by not complying with Florida law of contract interpretation when construing the Security Instrument. Under longstanding Florida law, recently applied to almost identical facts in *OneWest Bank, FSB v. Palmero*, a mortgage contract must be construed based on a review of all of the documents executed contemporaneously with the formation of the contract. Moreover, when there is a conflict between the terms of a mortgage and the terms of the promissory note evidencing the debt secured by the mortgage, the promissory note's language controls. The Bankruptcy Court erred by failing to apply this settled Florida law to the facts of this case, and its order should be reversed.

A.     **Florida Law Mandates that Courts Construe all Reverse Mortgage Loan Documents Together.**

The Bankruptcy Court erred as a matter of law by refusing to construe the Security Instrument with all other loan documents executed at the time of the reverse mortgage transaction. Rather, the Bankruptcy Court limited its consideration to the four corners of the Security Instrument, holding that the definition of the term "Borrower" in that document was unambiguous. Based on that conclusion the Bankruptcy Court did not address the terms of any other loan documents that were

21

contrary to the Bankruptcy Court's interpretation. *See* DE 59 at 3-4; Tr. 3/6/18 at 5; Tr. 5/8/18 at 27-29.

Under Florida principles of contract interpretation, "the rule is that where other instruments are executed contemporaneously with a mortgage and are part of the same transaction, a mortgage may be modified by other instruments and all the documents are to be read together to determine and give effect to the intention of the parties." *Boyette v. Carden*, 347 So. 2d 759, 761 (Fla. 1st DCA 1977). The intention of the parties "is accomplished not only from the face of the [mortgage] instrument but also from the situation of the parties and the nature and object of the transactions." *Id.*; *see also Graham v. Fitts*, 43 So. 512, 513-14 (Fla. 1907) ("The note and mortgage were executed at the same time in one transaction relating to the note. Therefore they should be considered together in determining their meaning and effect."); *MV Insurance Consultants v. NAFH Nat. Bank*, 87 So. 3d 96, 99 (Fla. 3d DCA 2012); *Sardon Found. v. New Horizons Serv. Dogs, Inc.*, 852 So.2d 416, 420 (Fla. 5th DCA 2003) ("Where other instruments are executed contemporaneously with a mortgage and are part of the same transaction, the mortgage may be modified by these other instruments. All the documents should be read together to determine and give effect to the intention of the parties."); *Dodge City, Inc. v. Byrne*, 693 So. 2d 1033, 1035 (Fla. 2d DCA 1997) ("When the parties execute two or more documents concurrently, in the course of one transaction concerning the same

22

subject matter, the documents must be read and construed together."); *Palmero*, 2018 WL 1832326, at *4.

Moreover, Florida law does not mandate that courts can only examine documents executed along with a mortgage if the mortgage itself is determined to be ambiguous within its four corners. *See Boyette*, 347 So. 2d at 761; *see also Graham*, 43 So. at 513-14 (construing terms of note and mortgage together before even considering whether mortgage was ambiguous); *Sardon Found.*, 852 So. 2d at 416 (trial court should examine terms of agreement executed with mortgage "to determine if a default has occurred" and "if the agreement is deemed ambiguous, parol evidence . . . would be admissible"); *Dodge City*, 693 So. 2d at 1034-35 (construing vehicle sale and loan agreements together without first finding that conditional sales contract was ambiguous); *Palmero*, 2018 WL 1832326, at *3-*4 (examining terms of related documents without finding mortgage is ambiguous). In fact, courts refer to all related loan documents to determine if there is any ambiguity in the agreement as a whole in the first place. *See Sardon Found.*, 852 So. 2d at 416; *In re Alford*, 381 B.R. 336, 340-41 (Bankr. M.D. Fla. 2007); *see also J.M. Montgomery Roofing Co. v. Fred Howland, Inc.*, 98 So. 2d 484, 486 (Fla. 1957) (parol evidence to determine intention of parties is appropriate where related contract "served to cast some doubt upon the meaning . . . [of a] provision of the

plaintiff's contract and to render ambiguous a contract that otherwise would not have been so").

Florida's Third District Court of Appeal recently applied this rule to a dispute concerning the enforceability of a reverse mortgage and held that loan documents indicated that the "remainderman" was not a "borrower" under the loan and thus could not remain in the mortgaged property following the borrower's death. In *Palmero*, the lender brought a foreclosure action against Luisa Palmero, claiming that her deceased husband Roberto had taken out a reverse mortgage and that his death triggered the lender's right to accelerate the mortgage debt and commence foreclosure proceedings. 2018 WL 1832326, at *1. Mr. and Mrs. Palmero executed the mortgage on separate signature lines underneath the statement "BY SIGNING BELOW, Borrower accepts and agrees to the terms contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it." *Id.* However, only Mr. Palmero signed the promissory note evidencing the payment obligation associated with the reverse mortgage. Further, only Mr. Palmero was named as the borrower in the loan application and loan agreement. *Id.* After trial, the circuit court granted judgment in favor of Mrs. Palmero, concluding that (1) she was not a "borrower" under the terms of the mortgage and thus Mr. Palmero's death triggered acceleration of the loan, but (2) federal law prevented the lender from

24

foreclosing on the property while Mrs. Palmero, the non-borrowing spouse, remained alive. *Id.* at *2.

On appeal, the Third District Court of Appeal affirmed the circuit court's holding that Mrs. Palmero was not a "borrower." In holding that the circuit court properly determined that Mrs. Palmero was not a "borrower," the court recognized that it was required to read all of the documents executed at the origination of the reverse mortgage together. *Id.* at *4 (citing *Sardon Found.*, 852 So. 2d at 420).[6] The court determined that reading the definition of "borrower" in the mortgage, along with the loan application executed by Mr. Palmero, the promissory note executed by Mr. Palmero, and a non-borrower spouse certification executed by Mrs. Palmero, made it clear that Mrs. Palmero was not a "borrower" under the reverse mortgage. *Id.* As the court stated, "[t]o the extent there was any confusion or inconsistency in

---

[6] In *Palmero*, the Third District Court of Appeal qualified its prior holdings in *Smith v. Reverse Mortgage Solutions*, *Inc.*, 200 So. 3d 221 (Fla. 3d DCA 2016) and *Edwards v. Reverse Mortgage Solutions, Inc.*, 187 So. 3d 895 (Fla. 3d DCA 2016), holding that its conclusion in those cases that the non-borrowing spouse under the reverse mortgage qualified as a "borrower" and could remain in the property following the spouse's death was due to the "limited record" in each case, which meant that there was no evidence indicating that the non-borrowing spouse was not a borrower. *Palmero*, 2018 WL 1832326, at *4. The Bankruptcy Court correctly recognized that its reliance on *Smith* and *Edwards* as the basis of its initial ruling overruling RMS's objection was no longer viable after *Palmero*. *See* Tr. 5/8/18 at 25 ("The bottom line is that *Palmero* does qualify the holdings in *Smith* and *Edwards* . . . .and so that portion of my opinion, I agree, is no longer a basis for my ruling."). To the extent the Debtor contends that *Smith* and *Edwards* still control this case, RMS reserves the right to address that argument in its reply brief.

the mortgage, it was cleared up by the note, loan application, loan agreement, and non-borrower spouse certification, which unequivocally provided that Mrs. Palmero was not the borrower for the reverse mortgage and defined Mr. Palmero as the borrower." *Id.*

The facts before the Bankruptcy Court are almost indistinguishable from *Palmero*, because the same or similar loan documents were used in both reverse mortgage transactions. In reaching its (incorrect) conclusion that the Security Instrument defined the Debtor as a "Borrower," the Bankruptcy Court relied upon two provisions, which are the same or substantially similar to those in *Palmero*. DE 59 at 4. First, the definition of "Borrower" in the Security Instrument is stated as follows:

> The mortgagor is **Olga Nunez a/k/a Olga E Nunez, a single woman, as to Life Estate interest and Aleida C Nunez, a single woman, as to the remainder,** whose address is **9940 Southwest 155th Avenue, Miami, FL 33196** ("Borrower").

DE 48 at 18 (emphasis in original). The mortgage in the *Palmero* case had similar language, "the borrower was defined as 'Roberto Palmero, a married man reserving a life estate unto himself with the ramainderman [sic] to Luisa Palmero, his wife, Idania Palmero, a single woman and Rene Palmero, a single man.'" *Palmero*, 2018 WL 1832326, at *1.

Second, in its oral ruling on the motion to alter or amend the Memorandum Opinion, the Bankruptcy Court discussed the use of the term "Borrower" with the

signatures on the Security Instrument. Tr. 5/8/18 at 28-29. The Bankruptcy Court's suggestion is that if the Debtor was not a "Borrower" as that term is used on the signature page, she was not bound to the Security Instrument, and the Security instrument "could be invalid." Tr. 5/8/18 at 28-30. But once again, the *Palmero* court was faced with similar language on the signature page and enforced the reverse mortgage in a manner that allowed the lender to proceed with foreclosure. In *Palmero*, the signature page provided: "BY SIGNING BELOW, Borrower accepts and agrees to the terms contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it." *Palmero*, 2018 WL 1832326, at *1. Olga Nunez and the Debtor signed below almost the same language: "BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it." DE 48 at 24. One distinguishing characteristic of the signature page of the Security Instrument was that the Debtor was identified "AS REMAINDERMAN." *See id.* Mrs. Palmero, on the other hand, signed as "Luisa Palmero (Borrower)." *See Palmero*, 2018 WL 1832326, at *5. Even this further designation of the surviving spouse as a "Borrower" did not prevent the Third Circuit Court of Appeal from upholding the trial court's determination that Mrs. Palmero was not protected by the default provision in the reverse mortgage.

The loan transaction in *Palmero* is also similar to the facts presented in this

matter. An individual is attempting to stop the lender from pursuing all rights and remedies under the note and reverse mortgage, but that individual did not sign the underlying note, loan application, or loan agreement. *See Palmero*, 2018 WL 1832326, at \*1. The Debtor similarly did not sign the Note, the Loan Agreement, the reverse mortgage application, or any other related documents, in any capacity. *See* DE 48 at 27-62. Consideration of these contemporaneously executed documents was critical to the *Palmero* court's decision rejecting the argument that "Mrs. Palmero was a surviving borrower still living on the property . . . [and] foreclosure was premature . . . ." *See Palmero*, 2018 WL 1832326, at \*3-4.

The Bankruptcy Court erred by as a matter of law by failing to engage in the same analysis, and reach the same conclusion.[7]

### B.    If There Is An Inconsistency Between the Language of the Note and Mortgage, the Note Controls.

Florida's rule of construing all mortgage loan documents together is of particular importance where the note and mortgage are inconsistent. *See Boyette*,

---

[7] Courts in other jurisdictions have reached the same result as *Palmero* in similar situations. *See In re D'Alessio*, AP No. 17-3026, 2018 WL 2972340 (Bankr. D. Mass. June 11, 2018); *Consolo v. Bank of America*, 2017 WL 1739171 (D. Mass. May 2, 2017); *Pikaart v. Financial Freedom*, 2017 WL 5624747 (W.D. Mich. Oct. 31, 2017), *Report and Recommendation adopted*, 2017 WL 5571120 (W.D. Mich. Nov. 11, 2017); *Nationstar Mortgage, LLC d/b/a Champion Mortgage Company v. Williams*, 2016 WL 5887356, at \*3-5 (Pa. Super. Ct. Sept. 12, 2016); *Washington-Jarmon v. Onewest Bank, FSB*, 513 S.W.3d 103 (Tex. App.—Houston [14th Dist.] 2016, no pet.).

347 So. 2d at 761. In such a situation, the terms of the note prevail over any conflicting terms of the mortgage. *Graham*, 43 So. at 514 ("it is clear that the provisions of the note control" over the default provisions in the mortgage); *see also Hotel Mgmt. Co. v. Krickl*, 158 So. 118, 119 (Fla. 1934) ("The general rule is that, if there is a conflict between the terms of a note and mortgage, the note should prevail."); *Cleveland v. Crown Fin'l, LLC*, 183 So. 3d 1206, 1210 (Fla. 1st DCA 2016); *Lewis v. Estate of Turcol*, 709 So. 2d 186, 187 (Fla. 5th DCA 1998) ("where the relationship described between the two persons named as payees in the note directly conflicts with the relationship specified between the two persons named as mortgagees in the mortgage instrument, the terms of the note should prevail").

Such an inconsistency exists among the Note and Security Instrument as a result of the Bankruptcy Court's interpretation. The Note clearly provides that Olga Nunez is the "Borrower," that it is only enforceable through sale of the "Property covered by the Security Instrument," and that it is due and payable immediately when "a Borrower dies and the Property is not the principal residence of at least one surviving Borrower." *See* DE 48 at 27-28. Under the terms of the Note, there is no consideration of whether any party other than Olga Nunez is still using the Property as a principal residence before the Note is payable in full and enforceable by foreclosure. But the Bankruptcy Court's interpretation of the Security Instrument eviscerates the lender's rights under the Note. Based on the Bankruptcy Court's

interpretation, a party who did not sign the Note now has the right to maintain possession of the property for life without paying the Note in full. That was clearly not the intent of the parties based upon a full examination of all relevant loan documents. *See Washington-Jarmon v. Onewest Bank, FSB*, 513 S.W.3d 103, 109-10 (Tex. App.—Houston [14th Dist.] 2016, no pet.) ("to the extent the deed of trust may be construed as identifying appellant as a borrower, it conflicts with the terms of the note, which control").

In sum, the Bankruptcy Court erred in its conclusion that Florida law does not allow courts to "look[] at documents to alter defined terms for the purposes of one particular document in the absence of an ambiguity." DE 59 at 4. Florida law mandates that courts look to all loan documents to determine the parties' intent, and that the note's terms control over the mortgage. The Bankruptcy Court's analysis is inconsistent with Florida law.

### C.   Properly Construing the Term "Borrower" as Excluding the Debtor Does Not Render the Security Instrument Invalid.

Despite recognizing the *Palmero* decision (and the fact that *Palmero* undermined the Bankruptcy Court's reliance on *Smith* and *Edwards* as the basis for its original order overruling RMS's objection), the Bankruptcy Court nonetheless overruled RMS's objection based on its determination that if the Debtor was not a "Borrower" as that term is used on the signature page, she may not be bound to the

Security Instrument, and the Security instrument "could be invalid." Tr. 5/8/18 at 28-30. That reasoning is wrong as a matter of law.

As an initial matter, the Debtor never argued that the Security Instrument is invalid or unenforceable *in toto* as a matter of law if she is not defined as the "Borrower" for purposes of the signature page. The Debtor primarily relied on *Smith* and *Edwards*, which are distinguishable (as the Bankruptcy Court properly recognized). The dispute before the Bankruptcy Court was never if the Debtor was bound by the Security Instrument, but whether the Note and Security Instrument allowed RMS to declare all sums due and foreclose once the Debtor's mother passed away. The proper interpretation of the Security Instrument, as set forth in *Palmero*, is that the Debtor granted her interest in the property as security for her mother's reverse mortgage loan, and the Debtor is not entitled to keep the property until death without paying the Note in full.

The Bankruptcy Court's alternative explanation for its decision has no basis in law or fact. "The law assumes that parties have made an agreement for some lawful, enforceable purpose, that courts should not apply a strained or unusual meaning so as to render it entirely unenforceable." *J.R.D. Mgmt. Corp. v. Dulin*, 883 So. 2d 314, 317 (Fla. 4th DCA 2004); *see also Excelsior Ins. Co. v. Pomona Park Bar & Package Store*, 369 So. 2d 938, 941 (Fla. 1979) ("[I]n the belief that the parties intended their agreement to be valid, a contract ought not be readily

interpreted as ineffective."); *Gollnick v. Barker*, 114 So. 527 (Fla. 1927) ("Neither artifice of form nor superficial declaration of intention will successfully obscure the true nature of [a mortgage] transaction.").

Here, the reason that both the Debtor and her mother had to execute the Security Instrument is evident from its face. Olga Nunez had a life estate in the property, which is an estate in land measured by Olga Nunez's life. *See* 19 Fla. Prac., Florida Real Estate § 1:4 (2018 ed.). The Debtor was the remainderman, having a future interest in the property after the life estate of Olga Nunez expired. *Id.* § 2:6. Under Florida law, a mortgagor can grant no greater interest in property than they own. *See Gonzalez v. Chase Home Finance, LLC*, 37 So. 3d 955, 957 (Fla. 3d DCA 2010); *see also* HUD Mortgagee Letter 1997-15 ("If an eligible mortgagor holds only a life estate when the mortgage is executed, all holders of any future interest in the property (remainder or reversion) will also be required to execute the mortgage to ensure that the mortgage is secured by a fee simple interest."), *available at* https://www.hud.gov/sites/ documents/DOC_20448.TXT. Thus, both the Debtor and Olga Nunez had to sign the Security Instrument to fully encumber all interests in the property.

The Bankruptcy Court's assumption that the Debtor had to execute the Security Instrument as a "Borrower" in order for it to be enforceable is a *non sequitur*. The Debtor executed the Security Instrument in order to allow it to be

32

enforceable as to her interest in the Property as the "Remainderman"—her signature is notated with that information. *See CitiMortgage, Inc. v. Turner*, 172 So. 3d 502, 505 (Fla. 1st DCA 2015) (holding that co-mortgagor's execution of mortgage with notation of "Limited Purpose Execution" indicated that mortgage was enforceable against co-mortgagor's half interest in the mortgaged property, but did not obligate the co-mortgagor to repay the note). Even if there were any ambiguity as to the definition of "Borrower" in the Security Instrument (and, as discussed above, the Note and other documents executed with the Security Instrument make it clear that only Olga Nunez was a "Borrower"), that would not change the fact that RMS may enforce the Security Instrument against the Debtor and her interest in the Property.[8]

In fact, the Bankruptcy Court's reasoning on this point was implicitly rejected in *Palmero*. In *Palmero*, the Court expressly noted that Mrs. Palmero executed the

---

[8] Many theories support enforcement of the Security Instrument, regardless of the use or misuse of the term "Borrower" on the signature page. *See, e.g.*, *Holmes v. Dunning*, 133 So. 557, 557 (Fla. 1931) ("[n]otwithstanding the obscurity or inartificiality with which a contract is drawn, if it is fairly open to the construction that it is an equitable mortgage, a court will so treat it"); *In re Marcum*, 508 B.R. 499, 502 (Bankr. M.D. Fla. 2014) (applying Florida law and holding "that so long as an agreement exists that indicates intent to create a mortgage, an equitable lien may be imposed with the mortgages never actually executed"); *Countrywide Home Loans, Inc. v. Kim*, 898 So. 2d 250, 250-51 (Fla 4th DCA 2005) (enforcing mortgage through reformation to add missing signature); *Harris v. Walbridge*, 488 So. 2d 881 (Fla 1st DCA 1986) (estoppel bars party's challenge to enforcement of mortgage based on technical deficiency in authentication). RMS reserves all rights, claims, and defenses with respect to its interest in the property securing the Note under the Security Instrument and applicable law.

mortgage under a signature block that stated "'BY SIGNING BELOW, Borrower accepts and agrees to the terms contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.'" 2018 WL 1832326, at *1. The Court concluded that even though (1) Mrs. Palmero "signed as the borrower under this sentence," *id.*, (2) she was not a borrower who was entitled to remain in the property following Mr. Palmero's death, *id.* at *3-*4, and (3) the lender was entitled to a judgment of foreclosure on the mortgage. *Id.* at *5. If Mrs. Palmero's non-borrower status rendered the mortgage invalid, then the lender could not have obtained a judgment of foreclosure. Applying that same reasoning here, the Bankruptcy Court erred as a matter of law in holding that the Debtor must qualify as a "borrower" in order to sustain the validity of the Security Instrument, and its order overruling RMS's objection should be reversed.

> **D.    The Code of Federal Regulations and HUD Mortgagee Letter Do not Control the terms of the Security Instrument.**

The Bankruptcy Court further erred by holding that the federal regulations in effect at the time of the origination of the reverse mortgage loan indicated that the Debtor qualified as a "Borrower." *See* Tr. 5/8/18 at 27-28; DE at 6-7. First, as RMS made clear to the Bankruptcy Court, there is no federal law governing the enforceability of reverse mortgage loans between the parties. *See* DE 63 at 8-9. There is federal law dictating what requirements a reverse mortgage loan must meet in order to be insured by the Department of Housing and Urban Development ("HUD")

under the FHA Home Equity Conversion Mortgage program. The requirements for

HUD insurance do not dictate the terms between the lender and the borrower, as

reflected in the parties' loan documents. For example, in *Estate of Jones v. Live Well*

*Fin., Inc.*, 2017 WL 4176661 (N.D. Ga. Sept. 20, 2017), the U.S. District Court for

the Northern District of Georgia correctly recognized this argument as a red herring:

"[W]hether the reverse mortgage here is insurable by HUD is not at issue. Instead,

the enforceability of the terms of the Reverse Mortgage are at issue." [9] 2017 WL

4176661, at *4.

---

[9] *See also id.* ("Even if the Reverse Mortgage is uninsurable under [12 U.S.C.] § 1715z–20(j), the Defendant still has the right to enforce the terms of the agreement."); *Fed. Nat'l Mortg. Ass'n v. Takas*, No. 2:17-cv-204, 2017 WL 3016785, at *5 (D. Utah July 14, 2017) (concluding that 12 U.S.C. § 1715z–20(j) "is inapplicable to the validity or enforceability of [the borrower's] [r]everse [m]ortgage"); *Nationstar Mortg., LLC v. Goeke*, 57 N.Y.S.3d 223, 225-26 (N.Y. App. Div. 2017) (rejecting argument that federal law barred foreclosure of reverse mortgage against non-borrowing spouse and holding that trial court erred in granting summary judgment in favor of non-borrowing spouse in light of indications that only husband applied for loan and only husband executed promissory note); *Washington-Jarmon v. OneWest Bank, FSB*, 513 S.W.3d 103 (Tex. Ct. App. – Houston, Nov. 22, 2016) (affirming summary judgment against the non-borrowing spouse on a reverse mortgage based on evidence that only husband applied for the loan, signed the loan agreement, and executed the note, and wife executed ownership interest certification acknowledging her status as a non-borrowing spouse); *Nationstar Mortg. LLC v. Carey*, C.A. No. 9274-MA, 2014 WL 6735445 (Del. Ch. Nov. 26, 2014) (recommending summary judgment to be entered in favor of reverse mortgage holder and rejecting argument that federal law provided non-borrowing spouse a right to remain in the property), *recommendation accepted and judgment entered*, 2014 WL 7149146.

The sections of the Code of Federal Regulations and the interpretative bulletins issued by HUD addressing reverse mortgage insurance do not control interpretation of the Security Instrument or its enforceability. Those regulations only affect whether RMS (or any other reverse mortgage lender) can recover insurance proceeds for any shortfall on the loan following foreclosure. These regulations do not govern or impair RMS's rights under the Note to declare all sums due and payable and foreclose if necessary. The rights among the parties to the reverse loan mortgage are set forth in the terms of the documents governing the mortgage loan relationship, including the Security Instrument and Note.[10]

Second, even if the federal regulations and regulatory guidance regarding the insurability of reverse mortgage loans *were* relevant, the Bankruptcy Court erred by interpreting the regulations as indicating that the Debtor qualified as a "borrower." In support of its conclusion that the Debtor had to qualify as a "borrower" in order for the Security Instrument to "comply with the applicable law," the Bankruptcy Court quoted 24 C.F.R. § 206.27(c)(1)'s provision that a reverse mortgage becomes due and payable "if a mortgagor dies and the property is not the principal residence of at least one surviving mortgagor." DE at 6. The unspoken assumption in the

---

[10] The Security Instrument actually contemplates a failure to obtain or maintain HUD insurance. In that instance, the lender may "require immediate payment of all sums secured by this Security Instrument" regardless of whether a "Borrower" is still maintaining the property as a residence. *See* DE 48 at 21.

Bankruptcy Court's reasoning is that because the Debtor became a co-mortgagor by executing the Security Instrument as a "remainderman," she must be treated as a "borrower" with the right to remain in the Property following Olga Nunez's death in order for the Security Instrument to be insurable. But the Bankruptcy Court failed to note that the version of 24 C.F.R. § 206.3 then in effect expressly defined the term "mortgagor" as "each original **borrower** under a **mortgage**." 24 C.F.R. § 206.3 (2008) (emphasis added). And the term "mortgage" was defined as "a first lien on real estate under the laws of the jurisdiction where the real estate is located . . . . [and] also includes **the credit instrument, or note, secured by the lien, and the loan agreement between the mortgagor, the mortgagee and the Secretary**." *See id.* (emphasis added). For all of the reasons explained above, the Debtor was not a "borrower"—thus 24 C.F.R. § 206.27(c)(1) provided no support for her supposed right to remain in the Property without paying back the balance of the reverse mortgage loan in full.[11]

---

[11] In fact, the opposite is true: HUD's regulations expressly required that, to be insurable, a reverse mortgage must allow the lender to foreclose upon the borrower's death, even if the borrower's surviving spouse (who may be a co-mortgagor) remained alive and occupied the property. The conflict between HUD's regulations and Congress's express statutory mandate that the reverse mortgage insurance program provide foreclosure protections for surviving non-borrowing spouses, *see* 12 U.S.C. § 1715z-20(j), led to significant litigation and, ultimately, a change in HUD's policy and regulations. *See Bennett v. Donovan*, 4 F. Supp. 3d 5 (D.D.C. 2013).

The Bankruptcy Court also erroneously pointed to Mortgagee Letter 1997-15 as supporting its conclusion that the Debtor qualified as a "borrower" for the purposes of the Security Instrument. DE at 6-8. The Bankruptcy Court's reliance on Mortgagee Letter 1997-15 as support for its holding is misplaced, as nothing in the Letter suggests that a co-mortgagor qualifies as a "borrower." As the Bankruptcy Court correctly noted, Mortgagee Letter 1997-15 expressly (1) requires a holder of a remainder interest in a life estate to execute a reverse mortgage in order for the reverse mortgage to be insurable by HUD, and (2) notes that the party with the remainder interest "does not execute the note or loan agreement and does not have the rights to loan proceeds of other mortgagors." DE at 7. But **nothing** in Mortgagee Letter 1997-15 suggests that the holder of a future interest qualifies as a "borrower" and is entitled to remain in the mortgaged property following the death of the "borrower" under the promissory note without paying the balance of the loan in full. The Bankruptcy Court's conclusion to the contrary was wholly unfounded.

### E.   *Johnson v. Home State Bank* Does Not Support the Bankruptcy Court's Ruling.

The Bankruptcy Court cited *Johnson v. Home State Bank*, 501 U.S. 78 (1991) in the Memorandum Opinion, for the proposition that "a debtor may treat a mortgage encumbering property of the debtor in a chapter 13 plan even if the debtor has no *in personam* liability." DE 59 at 7. The Bankruptcy Court was accurate in its summary of *Johnson v. Home State Bank*, but that decision does not support the ultimate

resolution of the dispute before the Bankruptcy Court. The Debtor's rights in chapter 13 depend upon the proper interpretation of the Security Instrument, considering all documents executed as part of Olga Nunez's reverse mortgage loan.

The Bankruptcy Court's conclusion, based on its interpretation of the Security Instrument, was that the Debtor could maintain possession of the property merely by "curing the defaults relating to taxes and insurance." DE 59 at 8. Applying the proper interpretation of the Note and Security Instrument—that RMS is entitled to enforce the Note and Security Instrument upon Olga Nunez's death—the Debtor still has rights in the property in chapter 13. But rather than merely curing overdue taxes and insurance, the Debtor may only keep the property if she pays the Note in full during the course of her chapter 13 plan. *See* 11 U.S.C. §§ 1322(c)(2), 1325(a)(5); *see also In re Gray*, 530 B.R. at 501-02 (debtor may pay off mother's reverse mortgage over life of chapter 13 plan even though debtor was not borrower under reverse mortgage); *In re Harmon*, 2015 WL 8249995 (Bankr. M.D. Fla. Dec. 2, 2015) (same). This has been RMS's position since it filed its initial objection, and *Johnson v. Home State Bank* does not change the analysis or support the Bankruptcy Court's conclusion in the Memorandum Opinion. *See* DE 19.

## II.   The Bankruptcy Court Erred by Failing to Hold an Evidentiary Hearing.

RMS contends that the Bankruptcy Court erred in its interpretation of the Security Instrument as a matter of law, and this Court may reverse on that basis

alone. *See Ave. CLO Fund Ltd.*, 709 F.3d at 1077 ("The interpretation of a contract is a question of law that the court reviews *de novo*."). But, alternatively, to the extent the Bankruptcy Court believed that there was any ambiguity in the definition of "Borrower" in the Security Instrument, it erred by failing to hold an evidentiary hearing to consider parol evidence of the parties' intent. *See Sardon Found.*, 852 So. 2d at 420 (if mortgage agreement is deemed ambiguous based on terms of all loan documents parol evidence is admissible to ascertain the parties' true intent); *In re Alford*, 381 B.R. at 340-41 (denying summary judgment where mortgage and related agreement had conflicting terms creating ambiguity).

Furthermore, the Security Instrument identifies the Debtor as "REMAINDERMAN" both on the first page and on her signature line. Under similar circumstances in a reverse mortgage dispute, the Fourth District Court of Appeal has held that the reverse mortgage was ambiguous, summary judgment was inappropriate, and the parties should have the opportunity to present parol evidence. *See Nationstar Mortgage Co. v. Levine*, 216 So. 3d at 713-17.

The Debtor's plan and RMS's objection were contested matters, and the Bankruptcy Rules contemplate the opportunity to present testimony and other evidence. *See* Fed. R. Bankr. P. 3015, 9014. The Bankruptcy Court denied RMS any opportunity to present evidence, and summarily ruled that the Debtor was entitled to stay in the property for life without paying the Note in full. This was reversible error

40

for all the reasons discussed herein.

## CONCLUSION

For the foregoing reasons, this Court should reverse the Bankruptcy Court's order overruling RMS's objection to confirmation of the Chapter 13 Plan.

Respectfully submitted this 2nd day of August, 2018.

/s/ *Edwin G. Rice*
Edwin G. Rice
Florida Bar No.855944
erice@bradley.com
BRADLEY ARANT BOULT CUMMINGS, LLP
100 N. Tampa Street, Suite 2200
Tampa, FL  33602
Telephone:  (813) 229-3333
Facsimile:   (813) 229-5946

## CERTIFICATE OF SERVICE

I hereby certify that on August 2, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following parties:

Gianny Blanco
Freire & Gonzalez, P.A.
10647 N. Kendall Drive
Miami, FL 33176
Email: gianny@freiregonzalez.com

Laila Shilleh Gonzalez
Freire & Gonzalez
1800 W 49 Street
Suite 311
Hialeah, FL 33012-2947
Email: freire-gonzalez@anewbroadband.net

And I hereby certify that on August 2, 2018, I served the foregoing by U.S. Mail addressed to the following parties:

Edward Freire
Freire & Gonzalez, P.A.
10647 N. Kendall Drive
Miami, FL 33176

Gianny Blanco
Freire & Gonzalez, P.A.
10647 N. Kendall Drive
Miami, FL 33176

Laila Shilleh Gonzalez
Freire & Gonzalez
1800 W 49 Street
Suite 311
Hialeah, FL 33012-2947

/s/ Edwin G. Rice
OF COUNSEL

CERTIFICATE OF COMPLIANCE

I hereby certify that this document complies with the word limit of Fed. R.

Bankr. P. 8015(a)(7)(B) because, excluding the parts of the document exempted by

Fed. R. Fed. R. Bankr. P. 8015(a)(7)(B)(iii), this document contains 9,560 words.


/s/ Edwin G. Rice
OF COUNSEL

STATUTORY APPENDIX

**11 U.S.C. § 1322.  Contents of Plan**

(a) The plan--

> (1) shall provide for the submission of all or such portion of future earnings or other future income of the debtor to the supervision and control of the trustee as is necessary for the execution of the plan;

> (2) shall provide for the full payment, in deferred cash payments, of all claims entitled to priority under section 507 of this title, unless the holder of a particular claim agrees to a different treatment of such claim;

> (3) if the plan classifies claims, shall provide the same treatment for each claim within a particular class; and

> (4) notwithstanding any other provision of this section, may provide for less than full payment of all amounts owed for a claim entitled to priority under section 507(a)(1)(B) only if the plan provides that all of the debtor's projected disposable income for a 5-year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.

(b) Subject to subsections (a) and (c) of this section, the plan may--

> (1) designate a class or classes of unsecured claims, as provided in section 1122 of this title, but may not discriminate unfairly against any class so designated; however, such plan may treat claims for a consumer debt of the debtor if an individual is liable on such consumer debt with the debtor differently than other unsecured claims;

> (2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims;

> (3) provide for the curing or waiving of any default;

App-1

(4) provide for payments on any unsecured claim to be made concurrently with payments on any secured claim or any other unsecured claim;

(5) notwithstanding paragraph (2) of this subsection, provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due;

(6) provide for the payment of all or any part of any claim allowed under section 1305 of this title;

(7) subject to section 365 of this title, provide for the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtor not previously rejected under such section;

(8) provide for the payment of all or part of a claim against the debtor from property of the estate or property of the debtor;

(9) provide for the vesting of property of the estate, on confirmation of the plan or at a later time, in the debtor or in any other entity;

(10) provide for the payment of interest accruing after the date of the filing of the petition on unsecured claims that are nondischargeable under section 1328(a), except that such interest may be paid only to the extent that the debtor has disposable income available to pay such interest after making provision for full payment of all allowed claims; and

(11) include any other appropriate provision not inconsistent with this title.

(c) Notwithstanding subsection (b)(2) and applicable nonbankruptcy law--

(1) a default with respect to, or that gave rise to, a lien on the debtor's principal residence may be cured under paragraph (3) or (5) of subsection (b) until such residence is sold at a foreclosure sale that is conducted in accordance with applicable nonbankruptcy law; and

(2) in a case in which the last payment on the original payment schedule for a claim secured only by a security interest in real property that is the debtor's principal residence is due before the date on which the final payment under

App-2

the plan is due, the plan may provide for the payment of the claim as modified pursuant to section 1325(a)(5) of this title.

(d)(1) If the current monthly income of the debtor and the debtor's spouse combined, when multiplied by 12, is not less than--

>   (A) in the case of a debtor in a household of 1 person, the median family income of the applicable State for 1 earner;

>   (B) in the case of a debtor in a household of 2, 3, or 4 individuals, the highest median family income of the applicable State for a family of the same number or fewer individuals; or

>   (C) in the case of a debtor in a household exceeding 4 individuals, the highest median family income of the applicable State for a family of 4 or fewer individuals, plus $7001 per month for each individual in excess of 4,

the plan may not provide for payments over a period that is longer than 5 years.

(2) If the current monthly income of the debtor and the debtor's spouse combined, when multiplied by 12, is less than--

>   (A) in the case of a debtor in a household of 1 person, the median family income of the applicable State for 1 earner;

>   (B) in the case of a debtor in a household of 2, 3, or 4 individuals, the highest median family income of the applicable State for a family of the same number or fewer individuals; or

>   (C) in the case of a debtor in a household exceeding 4 individuals, the highest median family income of the applicable State for a family of 4 or fewer individuals, plus $7001 per month for each individual in excess of 4,

the plan may not provide for payments over a period that is longer than 3 years, unless the court, for cause, approves a longer period, but the court may not approve a period that is longer than 5 years.

(e) Notwithstanding subsection (b)(2) of this section and sections 506(b) and 1325(a)(5) of this title, if it is proposed in a plan to cure a default, the amount necessary to cure the default, shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law.

(f) A plan may not materially alter the terms of a loan described in section 362(b)(19) and any amounts required to repay such loan shall not constitute "disposable income" under section 1325.

## 11 U.S.C. § 1325. Confirmation of plan

(a) Except as provided in subsection (b), the court shall confirm a plan if--

> (1) The plan complies with the provisions of this chapter and with the other applicable provisions of this title;

> (2) any fee, charge, or amount required under chapter 123 of title 28, or by the plan, to be paid before confirmation, has been paid;

> (3) the plan has been proposed in good faith and not by any means forbidden by law;

> (4) the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date;

> (5) with respect to each allowed secured claim provided for by the plan--

>> (A) the holder of such claim has accepted the plan;

>> (B)(i) the plan provides that--

>>> (I) the holder of such claim retain the lien securing such claim until the earlier of--

>>>> (aa) the payment of the underlying debt determined under nonbankruptcy law; or

App-4

(bb) discharge under section 1328; and

(II) if the case under this chapter is dismissed or converted without completion of the plan, such lien shall also be retained by such holder to the extent recognized by applicable nonbankruptcy law;

(ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; and

(iii) if--

(I) property to be distributed pursuant to this subsection is in the form of periodic payments, such payments shall be in equal monthly amounts; and

(II) the holder of the claim is secured by personal property, the amount of such payments shall not be less than an amount sufficient to provide to the holder of such claim adequate protection during the period of the plan; or

(C) the debtor surrenders the property securing such claim to such holder;

(6) the debtor will be able to make all payments under the plan and to comply with the plan;

(7) the action of the debtor in filing the petition was in good faith;

(8) the debtor has paid all amounts that are required to be paid under a domestic support obligation and that first become payable after the date of the filing of the petition if the debtor is required by a judicial or administrative order, or by statute, to pay such domestic support obligation; and

(9) the debtor has filed all applicable Federal, State, and local tax returns as required by section 1308.

App-5

For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910-day period preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor, or if collateral for that debt consists of any other thing of value, if the debt was incurred during the 1-year period preceding that filing.

(b)(1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan--

> (A) the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or

> (B) the plan provides that all of the debtor's projected disposable income to be received in the applicable commitment period beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan.

> (2) For purposes of this subsection, the term "disposable income" means current monthly income received by the debtor (other than child support payments, foster care payments, or disability payments for a dependent child made in accordance with applicable nonbankruptcy law to the extent reasonably necessary to be expended for such child) less amounts reasonably necessary to be expended--

> > (A)(i) for the maintenance or support of the debtor or a dependent of the debtor, or for a domestic support obligation, that first becomes payable after the date the petition is filed; and

> > > (ii) for charitable contributions (that meet the definition of "charitable contribution" under section 548(d)(3)) to a qualified religious or charitable entity or organization (as defined in section 548(d)(4)) in an amount not to exceed 15 percent of gross income of the debtor for the year in which the contributions are made; and

(B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.

(3) Amounts reasonably necessary to be expended under paragraph (2), other than subparagraph (A)(ii) of paragraph (2), shall be determined in accordance with subparagraphs (A) and (B) of section 707(b)(2), if the debtor has current monthly income, when multiplied by 12, greater than--

(A) in the case of a debtor in a household of 1 person, the median family income of the applicable State for 1 earner;

(B) in the case of a debtor in a household of 2, 3, or 4 individuals, the highest median family income of the applicable State for a family of the same number or fewer individuals; or

(C) in the case of a debtor in a household exceeding 4 individuals, the highest median family income of the applicable State for a family of 4 or fewer individuals, plus $7001 per month for each individual in excess of 4.

(4) For purposes of this subsection, the "applicable commitment period"--

(A) subject to subparagraph (B), shall be--

(i) 3 years; or

(ii) not less than 5 years, if the current monthly income of the debtor and the debtor's spouse combined, when multiplied by 12, is not less than--

(I) in the case of a debtor in a household of 1 person, the median family income of the applicable State for 1 earner;

(II) in the case of a debtor in a household of 2, 3, or 4 individuals, the highest median family income of the applicable State for a family of the same number or fewer individuals; or

App-7

(III) in the case of a debtor in a household exceeding 4 individuals, the highest median family income of the applicable State for a family of 4 or fewer individuals, plus $7001 per month for each individual in excess of 4; and

(B) may be less than 3 or 5 years, whichever is applicable under subparagraph (A), but only if the plan provides for payment in full of all allowed unsecured claims over a shorter period.

(c) After confirmation of a plan, the court may order any entity from whom the debtor receives income to pay all or any part of such income to the trustee.

## 12 U.S.C. § 1715z-20. Insurance of home equity conversion mortgages for elderly homeowners

(a) Purpose

The purpose of this section is to authorize the Secretary to carry out a program of mortgage insurance designed--

(1) to meet the special needs of elderly homeowners by reducing the effect of the economic hardship caused by the increasing costs of meeting health, housing, and subsistence needs at a time of reduced income, through the insurance of home equity conversion mortgages to permit the conversion of a portion of accumulated home equity into liquid assets; and

(2) to encourage and increase the involvement of mortgagees and participants in the mortgage markets in the making and servicing of home equity conversion mortgages for elderly homeowners.

(b) Definitions

For purposes of this section:

(1) The terms "elderly homeowner" and "homeowner" mean any homeowner who is, or whose spouse is, at least 62 years of age or such higher age as the Secretary may prescribe.

(2) The terms "mortgagee", "mortgagor", "real estate,"1 and "State" have the meanings given such terms in section 1707 of this title.

(3) The term "home equity conversion mortgage" means a first mortgage which provides for future payments to the homeowner based on accumulated equity and which a housing creditor (as defined in section 3802(2) of this title) is authorized to make (A) under any law of the United States (other than section 3803 of this title) or applicable agency regulations thereunder; (B) in accordance with section 3803 of this title, notwithstanding any State constitution, law, or regulation; or (C) under any State constitution, law, or regulation.

(4) Mortgage.--The term "mortgage" means a first mortgage or first lien on real estate, in fee simple, a first or subordinate mortgage or lien on all stock allocated to a dwelling unit in a residential cooperative housing corporation, or a first mortgage or first lien on a leasehold--

> (A) under a lease for not less than 99 years that is renewable; or

> (B) under a lease that has a term that ends no earlier than the minimum number of years, as specified by the Secretary, beyond the actuarial life expectancy of the mortgagor or comortgagor, whichever is the later date.

(5) First mortgage.--The term "first mortgage" means such classes of first liens as are commonly given to secure advances on, or the unpaid purchase price of, real estate or a first or subordinate lien on all stock allocated to a dwelling unit in a residential cooperative housing corporation, under the laws of the State in which the real estate or dwelling unit is located, together with the credit instruments, if any, secured thereby.

(c) Insurance authority

The Secretary may, upon application by a mortgagee, insure any home equity conversion mortgage eligible for insurance under this section and, upon such terms and conditions as the Secretary may prescribe, make commitments for the insurance

of such mortgages prior to the date of their execution or disbursement to the extent that the Secretary determines such mortgages--

(1) have promise for improving the financial situation or otherwise meeting the special needs of elderly homeowners;

(2) will include appropriate safeguards for mortgagors to offset the special risks of such mortgages; and

(3) have a potential for acceptance in the mortgage market.

(d) Eligibility requirements

To be eligible for insurance under this section, a mortgage shall--

(1) have been originated by a mortgagee approved by the Secretary;

(2) have been executed by a mortgagor who--

(A) qualifies as an elderly homeowner;

(B) has received adequate counseling, as provided in subsection (f), by an independent third party that is not, either directly or indirectly, associated with or compensated by a party involved in—

(i) originating or servicing the mortgage;

(ii) funding the loan underlying the mortgage; or

(iii) the sale of annuities, investments, long-term care insurance, or any other type of financial or insurance product;

(C) has received full disclosure, as prescribed by the Secretary, of all costs charged to the mortgagor, including costs of estate planning, financial advice, and other services that are related to the mortgage but are not required to obtain the mortgage, which disclosure shall clearly state which charges are required to obtain the mortgage and which are not required to obtain the mortgage; and

(D) meets any additional requirements prescribed by the Secretary;

(3) be secured by a dwelling that is designed principally for a 1- to 4-family residence in which the mortgagor occupies 1 of the units;

(4) provide that prepayment, in whole or in part, may be made without penalty at any time during the period of the mortgage;

(5) provide for a fixed or variable interest rate or future sharing between the mortgagor and the mortgagee of the appreciation in the value of the property, as agreed upon by the mortgagor and the mortgagee;

(6) contain provisions for satisfaction of the obligation satisfactory to the Secretary;

(7) provide that the homeowner shall not be liable for any difference between the net amount of the remaining indebtedness of the homeowner under the mortgage and the amount recovered by the mortgagee from--

    (A) the net sales proceeds from the dwelling that are subject to the mortgage (based upon the amount of the accumulated equity selected by the mortgagor to be subject to the mortgage, as agreed upon by the mortgagor and mortgagee); or

    (B) the insurance benefits paid pursuant to subsection (i)(1)(C);

(8) contain such terms and provisions with respect to insurance, repairs, alterations, payment of taxes, default reserve, delinquency charges, foreclosure proceedings, anticipation of maturity, additional and secondary liens, and other matters as the Secretary may prescribe;

(9) provide for future payments to the mortgagor based on accumulated equity (minus any applicable fees and charges), according to the method that the mortgagor shall select from among the methods under this paragraph, by payment of the amount--

    (A) based upon a line of credit;

    (B) on a monthly basis over a term specified by the mortgagor;

(C) on a monthly basis over a term specified by the mortgagor and based upon a line of credit;

(D) on a monthly basis over the tenure of the mortgagor;

(E) on a monthly basis over the tenure of the mortgagor and based upon a line of credit; or

(F) on any other basis that the Secretary considers appropriate;

(10) provide that the mortgagor may convert the method of payment under paragraph (9) to any other method during the term of the mortgage, except that in the case of a fixed rate mortgage, the Secretary may, by regulation, limit such convertibility; and

(11) have been made with such restrictions as the Secretary determines to be appropriate to ensure that the mortgagor does not fund any unnecessary or excessive costs for obtaining the mortgage, including any costs of estate planning, financial advice, or other related services.

(e) Disclosures by mortgagee

The Secretary shall require each mortgagee of a mortgage insured under this section to make available to the homeowner--

(1) at the time of the loan application, a written list of the names and addresses of third-party information sources who are approved by the Secretary as responsible and able to provide the information required by subsection (f);

(2) at least 10 days prior to loan closing, a statement informing the homeowner that the liability of the homeowner under the mortgage is limited and explaining the homeowner's rights, obligations, and remedies with respect to temporary absences from the home, late payments, and payment default by the lender, all conditions requiring satisfaction of the loan obligation, and any other information that the Secretary may require;

(3) on an annual basis (but not later than January 31 of each year), a statement summarizing the total principal amount paid to the homeowner under the loan secured by the mortgage, the total amount of deferred interest added to the

principal, and the outstanding loan balance at the end of the preceding year; and

(4) prior to loan closing, a statement of the projected total cost of the mortgage to the homeowner based on the projected total future loan balance (such cost expressed as a single average annual interest rate for at least 2 different appreciation rates for the term of the mortgage) for not less than 2 projected loan terms, as the Secretary shall determine, which shall include--

    (A) the cost for a short-term mortgage; and

    (B) the cost for a loan term equaling the actuarial life expectancy of the mortgagor.

(f) Counseling services and information for mortgagors

The Secretary shall provide or cause to be provided adequate counseling for the mortgagor, as described in subsection (d)(2)(B). Such counseling shall be provided by counselors that meet qualification standards and follow uniform counseling protocols. The qualification standards and counseling protocols shall be established by the Secretary within 12 months of July 30, 2008. The protocols shall require a qualified counselor to discuss with each mortgagor information which shall include--

    (1) options other than a home equity conversion mortgage that are available to the homeowner, including other housing, social service, health, and financial options;

    (2) other home equity conversion options that are or may become available to the homeowner, such as sale-leaseback financing, deferred payment loans, and property tax deferral;

    (3) the financial implications of entering into a home equity conversion mortgage;

    (4) a disclosure that a home equity conversion mortgage may have tax consequences, affect eligibility for assistance under Federal and State programs, and have an impact on the estate and heirs of the homeowner; and

    (5) any other information that the Secretary may require.

The Secretary shall consult with consumer groups, industry representatives, representatives of counseling organizations, and other interested parties to identify alternative approaches to providing consumer information required by this subsection that may be feasible and desirable for home equity conversion mortgages insured under this section and other types of reverse mortgages. The Secretary may, in lieu of providing the consumer education required by this subsection, adopt alternative approaches to consumer education that may be developed as a result of such consultations, but only if the alternative approaches provide all of the information specified in this subsection.

(g) Limitation on insurance authority

The aggregate number of mortgages insured under this section may not exceed 275,000. In no case may the benefits of insurance under this section exceed the maximum dollar amount limitation established under section 1454(a)(2) of this title for a 1-family residence.

(h) Administrative authority

The Secretary may--

　　(1) enter into such contracts and agreements with Federal, State, and local agencies, public and private entities, and such other persons as the Secretary determines to be necessary or desirable to carry out the purposes of this section;

　　(2) make such investigations and studies of data, and publish and distribute such reports, as the Secretary determines to be appropriate; and

　　(3) establish, by notice or mortgagee letter, any additional or alternative requirements that the Secretary, in the Secretary's discretion, determines are necessary to improve the fiscal safety and soundness of the program authorized by this section, which requirements shall take effect upon issuance.

(i) Protection of homeowner and lender

　　(1) Notwithstanding any other provision of law, and in order to further the purposes of the program authorized in this section, the Secretary shall take any action necessary--

(A) to provide any mortgagor under this section with funds to which the mortgagor is entitled under the insured mortgage or ancillary contracts but that the mortgagor has not received because of the default of the party responsible for payment;

(B) to obtain repayment of disbursements provided under subparagraph (A) from any source; and

(C) to provide any mortgagee under this section with funds not to exceed the limitations in subsection (g) to which the mortgagee is entitled under the terms of the insured mortgage or ancillary contracts authorized in this section.

(2) Actions under paragraph (1) may include--

(A) disbursing funds to the mortgagor or mortgagee from the Mutual Mortgage Insurance Fund;

(B) accepting an assignment of the insured mortgage notwithstanding that the mortgagor is not in default under its terms, and calculating the amount and making the payment of the insurance claim on such assigned mortgage;

(C) requiring a subordinate mortgage from the mortgagor at any time in order to secure repayments of any funds advanced or to be advanced to the mortgagor;

(D) requiring a subrogation to the Secretary of the rights of any parties to the transaction against any defaulting parties; and

(E) imposing premium charges.

(j) Safeguard to prevent displacement of homeowner

The Secretary may not insure a home equity conversion mortgage under this section unless such mortgage provides that the homeowner's obligation to satisfy the loan obligation is deferred until the homeowner's death, the sale of the home, or the occurrence of other events specified in regulations of the Secretary. For purposes of

App-15

this subsection, the term "homeowner" includes the spouse of a homeowner. Section 1647(b) of Title 15 and any implementing regulations issued by the Board of Governors of the Federal Reserve System shall not apply to a mortgage insured under this section.

(k) Insurance authority for refinancings

(1) In general

The Secretary may, upon application by a mortgagee, insure under this subsection any mortgage given to refinance an existing home equity conversion mortgage insured under this section.

(2) Anti-churning disclosure

The Secretary shall, by regulation, require that the mortgagee of a mortgage insured under this subsection, provide to the mortgagor, within an appropriate time period and in a manner established in such regulations, a good faith estimate of: (A) the total cost of the refinancing; and (B) the increase in the mortgagor's principal limit as measured by the estimated initial principal limit on the mortgage to be insured under this subsection less the current principal limit on the home equity conversion mortgage that is being refinanced and insured under this subsection.

(3) Waiver of counseling requirement

The mortgagor under a mortgage insured under this subsection may waive the applicability, with respect to such mortgage, of the requirements under subsection (d)(2)(B) (relating to third party counseling), but only if--

(A) the mortgagor has received the disclosure required under paragraph (2);

(B) the increase in the principal limit described in paragraph (2) exceeds the amount of the total cost of refinancing (as described in such paragraph) by an amount to be determined by the Secretary; and

(C) the time between the closing of the original home equity conversion mortgage that is refinanced through the mortgage insured under this

App-16

subsection and the application for a refinancing mortgage insured under this subsection does not exceed 5 years.

(4) Credit for premiums paid

Notwithstanding section 1709(c)(2)(A) of this title, the Secretary may reduce the amount of the single premium payment otherwise collected under such section at the time of the insurance of a mortgage refinanced and insured under this subsection. The amount of the single premium for mortgages refinanced under this subsection shall be determined by the Secretary based on the actuarial study required under paragraph (5).

(5) Actuarial study

Not later than 180 days after December 27, 2000, the Secretary shall conduct an actuarial analysis to determine the adequacy of the insurance premiums collected under the program under this subsection with respect to--

(A) a reduction in the single premium payment collected at the time of the insurance of a mortgage refinanced and insured under this subsection;

(B) the establishment of a single national limit on the benefits of insurance under subsection (g) (relating to limitation on insurance authority); and

(C) the combined effect of reduced insurance premiums and a single national limitation on insurance authority.

(6) Fees

The Secretary may establish a limit on the origination fee that may be charged to a mortgagor under a mortgage insured under this subsection, except that such limitation shall provide that the origination fee may be fully financed with the mortgage and shall include any fees paid to correspondent mortgagees approved by the Secretary.

(l) Funding for counseling

The Secretary may use a portion of the mortgage insurance premiums collected under the program under this section to adequately fund the counseling and disclosure activities required under subsection (f), including counseling for those homeowners who elect not to take out a home equity conversion mortgage, provided that the use of such funds is based upon accepted actuarial principles.

(m) Authority to insure home purchase mortgage

> (1) In general

> Notwithstanding any other provision of this section, the Secretary may insure, upon application by a mortgagee, a home equity conversion mortgage upon such terms and conditions as the Secretary may prescribe, when the home equity conversion mortgage will be used to purchase a 1- to 4-family dwelling unit, one unit of which the mortgagor will occupy as a primary residence, and to provide for any future payments to the mortgagor, based on available equity, as authorized under subsection (d)(9).

> (2) Limitation on principal obligation

> A home equity conversion mortgage insured pursuant to paragraph (1) shall involve a principal obligation that does not exceed the dollar amount limitation determined under section 1454(a)(2) of this title for a 1-family residence.

(n) Requirements on mortgage originators

> (1) In general

> The mortgagee and any other party that participates in the origination of a mortgage to be insured under this section shall--

>> (A) not participate in, be associated with, or employ any party that participates in or is associated with any other financial or insurance activity; or

>> (B) demonstrate to the Secretary that the mortgagee or other party maintains, or will maintain, firewalls and other safeguards designed to ensure that--

(i) individuals participating in the origination of the mortgage shall have no involvement with, or incentive to provide the mortgagor with, any other financial or insurance product; and

(ii) the mortgagor shall not be required, directly or indirectly, as a condition of obtaining a mortgage under this section, to purchase any other financial or insurance product.

(2) Approval of other parties

All parties that participate in the origination of a mortgage to be insured under this section shall be approved by the Secretary.

(o) Prohibition against requirements to purchase additional products

The mortgagor or any other party shall not be required by the mortgagee or any other party to purchase an insurance, annuity, or other similar product as a requirement or condition of eligibility for insurance under subsection (c), except for title insurance, hazard, flood, or other peril insurance, or other such products that are customary and normal under subsection (c), as determined by the Secretary.

(p) Study to determine consumer protections and underwriting standards

The Secretary shall conduct a study to examine and determine appropriate consumer protections and underwriting standards to ensure that the purchase of products referred to in subsection (o) is appropriate for the consumer. In conducting such study, the Secretary shall consult with consumer advocates (including recognized experts in consumer protection), industry representatives, representatives of counseling organizations, and other interested parties.

(r) Limitation on origination fees

The Secretary shall establish limits on the origination fee that may be charged to a mortgagor under a mortgage insured under this section, which limitations shall--

(1) be equal to 2.0 percent of the maximum claim amount of the mortgage, up to a maximum claim amount of $200,000 plus 1 percent of any portion of the maximum claim amount that is greater than $200,000, unless adjusted thereafter on the basis of an analysis of--

App-19

(A) the costs to mortgagors; and

(B) the impact on the reverse mortgage market;

(2) be subject to a minimum allowable amount;

(3) provide that the origination fee may be fully financed with the mortgage;

(4) include any fees paid to correspondent mortgagees approved by the Secretary;

(5) have the same effective date as subsection (m)(2) regarding the limitation on principal obligation; and

(6) be subject to a maximum origination fee of $6,000, except that such maximum limit shall be adjusted in accordance with the annual percentage increase in the Consumer Price Index of the Bureau of Labor Statistics of the Department of Labor in increments of $500 only when the percentage increase in such index, when applied to the maximum origination fee, produces dollar increases that exceed $500.

## 24 C.F.R. § 206.3. Definitions. (Effective February 7, 2008 to October 1, 2009)

As used in this part, the following terms shall have the meaning indicated . . . .

Mortgage means a first lien on real estate under the laws of the jurisdiction where the real estate is located. If the dwelling unit is in a condominium, the term mortgage means a first lien covering a fee interest or eligible leasehold interest in a one-family unit in a condominium project, together with an undivided interest in the common areas and facilities serving the project, and such restricted common areas and facilities as may be designated. The term refers to a security instrument creating a lien, whether called a mortgage, deed of trust, security deed, or another term used in a particular jurisdiction. The term mortgage also includes the credit instrument, or note, secured by the lien, and the loan agreement between the mortgagor, the mortgagee and the Secretary.

App-20

Mortgagor means each original borrower under a mortgage. The term does not include successors or assigns of a borrower . . . .

## 24 C.F.R. § 206.27. Mortgage provisions (Effective September 17, 1996 to September 18, 2017)

(a) Form. The mortgage shall be in a form meeting the requirements of the Secretary.

(b) Provisions. The mortgage shall explain how payments will be made to the mortgagor, how interest will be charged and when the mortgage will be due and payable. It shall also contain provisions designed to ensure compliance with this part and provisions on the following additional matters:

> (1) Payments by the mortgagee under the term or tenure payment options shall be mailed to the mortgagor or electronically transferred to an account of the mortgagor on the first business day of each month beginning with the first month after closing. Payments under the line of credit payment option shall be mailed to the mortgagor or electronically transferred to an account of the mortgagor within five business days after the mortgagee has received a written request for payment by the mortgagor.

> (2) The mortgagor shall maintain hazard insurance on the property in an amount acceptable to the Secretary and the mortgagee.

> (3) The mortgagor shall not participate in a real estate tax deferral program or permit any liens to be recorded against the property, unless such liens are subordinate to the insured mortgage and any second mortgage held by the Secretary.

> (4) A mortgage may be prepaid in full or in part in accordance with § 206.209.

> (5) The mortgagor must keep the property in good repair.

> (6) The mortgagor must pay taxes, hazard insurance premiums, ground rents and assessments in a timely manner, except to the extent such property charges are  paid by the mortgagee in accordance with § 206.205.

> (7) The mortgagor shall be charged for the payment of monthly MIP.

(8) The mortgagor shall have no personal liability for payment of the mortgage balance. The mortgagee shall enforce the debt only through sale of the property. The mortgagee shall not be permitted to obtain a deficiency judgment against the mortgagor if the mortgage is foreclosed.

(9) If the mortgage is assigned to the Secretary under § 206.121(b), the mortgagor shall not be liable for any difference between the insurance benefits paid to the mortgagee and the mortgage balance including accrued interest, owed by the mortgagor at the time of the assignment.

(10) If State law limits the first lien status of the mortgage as originally executed and recorded to a maximum amount of debt or a maximum number of years, the mortgagor shall agree to execute any additional documents required by the mortgagee and approved by the Secretary to extend the first lien status to an additional amount of debt and an additional number of years and to cause any other liens to be removed or subordinated.

(c) Date the mortgage comes due and payable.

(1) The mortgage shall state that the mortgage balance will be due and payable in full if a mortgagor dies and the property is not the principal residence of at least one surviving mortgagor, or a mortgagor conveys all or his or her title in the property and no other mortgagor retains title to the property. For purposes of the preceding sentence, a mortgagor retains title in the property if the mortgagor continues to hold title to any part of the property in fee simple, as a leasehold interest as set forth in § 206.45(a), or as a life estate.

(2) The mortgage shall state that the mortgage balance shall be due and payable in full, upon approval of the Secretary, if any of the following occur:

(i) The property ceases to be the principal residence of a mortgagor for reasons other than death and the property is not the principal residence of at least one other mortgagor;

(ii) For a period of longer than 12 consecutive months, a mortgagor fails to occupy the property because of physical or mental illness and the property is not the principal residence of at least one other mortgagor; or

App-22

(iii) An obligation of the mortgagor under the mortgage is not performed.

(d) Second mortgage to Secretary. Unless otherwise provided by the Secretary, a second mortgage to secure any payments by the Secretary as provided in § 206.121(c) must be given to the Secretary before a Mortgage Insurance Certificate is issued for the mortgage.